UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Dia Fredyma,
    Plaintiff

    v.                                Case No. 17-cv-311-SM
                                         Opinion No. 2019 DNH 043

Daniel J. Hurley,
    Defendant

**O R D E R**

Plaintiff, Dia Fredyma, brings this action against Daniel Hurley, a former officer in the Keene, New Hampshire Police Department.[1] By prior order, the court dismissed Fredyma's First Amendment retaliation claim. See Order dated February 16, 2018 (document no. 8). And, more recently, Fredyma has notified the court that "she does not object to the entry of judgment on the pendent state law claims." Plaintiff's Opposition Memorandum (document no. 14) at 1. So, at this point, Fredyma advances a single claim: that Officer Hurley violated her constitutionally protected right to be free from unreasonable seizures when Hurley deemed her to be "intoxicated" and took her into "protective custody" under the provisions of state law, N.H. Rev. Stat. Ann. ("RSA") ch. 172-B.

---

[1] Hurley is currently an officer with the Seabrook, New Hampshire Police Department.

Pending before the court is Hurley's motion for summary judgment. Fredyma objects. For the reasons discussed, that motion is granted.

**Standard of Review**

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted). Consequently, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014). In other

words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 451-52 (1st Cir. 2014). See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**Background**

On Saturday afternoon, July 19, 2014, Ms. Fredyma and her husband attended a wedding at the Keene Country Club, in Keene, New Hampshire. After the ceremony, they joined the wedding party and a number of guests at a reception at the same facility. While there, Fredyma says she ate dinner and drank "maybe two" Samuel Adams beers. Fredyma Deposition (document no. 11-6) at 23. She estimates the reception ended around 6 pm, id. at 25, at which point she, her husband, and several other guests drove to Waxy O'Connor's, a bar immediately adjacent to (but apparently unaffiliated with) the Best Western Hotel. They remained there for roughly seven and one-half hours, until the bar closed, at approximately 1:30 am. Id. at 28. Fredyma did not eat anything at the bar, but acknowledges that she did consume more beer - "I probably had another two or three more drinks." Id.

After the bar closed, Fredyma and her husband decided that, because they had been drinking, neither should drive home. See Id. at 29 ("Q: Do you think you could have operated a motor vehicle safely? A: No. That's why I was not driving."). See also Id. at 66 ("We chose not to drive. It's not - it would be illegal for us to drive. . . . It would have been illegal. So I should not have driven, and that's why I was where I was at."). Accordingly, they walked to the Best Western, where Fredyma spoke to the clerk at the front desk and asked whether there were any rooms available for the night. The clerk informed her that there were none. And, he told her that he had already contacted all the other local hotels, inquiring on behalf of other people, to see if any rooms were available. There were not. See Fredyma Deposition at 43 ("He told me that he spoke to every hotel nearby, including all the way over to Brattleboro, and there was no vacancies anywhere that could be found. And he already knew this because he called earlier.").

Fredyma described the front desk area as "hectic" and noted that the clerk was busy fielding calls from guests (there were, apparently, several complaints about noisy guests in another area of the hotel). The clerk was also dealing with another person who had come to the front desk. See Fredyma deposition at 41. The clerk told Fredyma that because he had already

4

checked with the area hotels about vacancies he was unwilling to do so again. He did, however, print out a list of those local hotels, with their phone numbers, and handed it to her. Id. at 42. Fredyma testified that she was "angry" and "frustrated" at that point, and "snatched" the paper from the clerk's hand. Id. at 44, 46, and 48. She doubted that he had actually called all of those hotels, id. at 43, and, because the battery in her cell phone was dead, she asked to use the front desk phone so she could personally verify the information he had shared with her. Id. at 45. The clerk told her that he was not permitted to allow guests to use the front desk phone, per company policy.

According to the clerk, Fredyma "was being vulgar and started calling [him] names," and told him "she was going to come across that counter and beat [him] down." Trial Transcript of State v. Joshua Fredyma (document no. 11-7) at 7.[2] Fredyma denies threatening the clerk. Nevertheless, given Fredyma's agitated state, the clerk warned her that he was going to call

---

[2] As a result of his own conduct during this early-morning encounter, Joshua Fredyma was arrested. Following a bench trial, he was found guilty of resisting arrest. See Trial Transcript (document no. 11-7) at 45. He appealed that conviction and, immediately prior to a de novo jury trial in the New Hampshire Superior Court, the parties negotiated a settlement: in exchange for his agreement not to pursue civil claims against the officers involved, the charge against him was dismissed. See Complaint at 3, n.1.

5

the police. Id. at 50. Around that time, Fredyma's husband, Joshua, arrived at the front counter. The desk clerk described his interaction with the couple as follows:

> But she then mentioned something about not having a phone, and could she use a phone. And I said, "Well, we don't have any public phone here." And that time the hotel was in renovation, and while normally we would have had several phones, one of which I guess I could have let her use, at this particular time we had only one phone, the hotel console. Which I'm not able - I cannot make available for public use.
>
> And I said this to her, and she wasn't satisfied with that. It was apparent to me that this was just a guest who wasn't going to take no for an answer. And she - I felt at the time she was probably intoxicated, so I was patient with her. Then she told me, "I want you to call every, you know, hotel around the town, and find out," and so on. And I said, "Look, I know there aren't any rooms available and I'm not going to do that. And I have, you know, quite enough to do here. I'm sorry, I can't help you. I just can't help you." And then she started - she was being vulgar and started calling me names, and so on. And I guess at some point she said - she referred to some military training, and how she was going to come across that counter and beat me down. Anyway, it was about this time when Mr. Fredyma came into the lobby. And I realized then that they were in fact together, though I had suspected that with her having come in so soon after he had been in.
>
> And then it began. He walked up to the office at the end of the counter. So one - they were at opposite ends of the counter where I was working. And he started asking the same questions that she had just asked. And then, "Well, why can't she use the phone?" And you know, I had to - again, I explained to them that there are no rooms, and I don't have any phone

6

> available, and that I can't help them. You know, I'm
> sorry.
>
> The situation went from hounding to just harassment,
> to out and out threatening. And I was very concerned.
> I was all alone. You know, a large hotel full of
> guests, many of whom were complaining, calling me on
> the phone as I was trying to have this conversation
> with these two people. And it was simply - I was
> putting myself in danger. (Tr. 8).

Trial Transcript at 6-8.

At that point, Fredyma admits she was getting "more and more frustrated" and concedes that it was "very possible" that she was swearing at the clerk. Although she denies "yelling," she admits she was "very animated" and "speaking in a raised voice." She also began to cry. Fredyma Deposition at 55-57 and 59. She also admits that she smelled of beer, and agrees that it was "possible" that she had red, bloodshot, glassy eyes. Id. at 58. At 1:52 am, the front desk clerk called the Keene Police Department to report a disturbance at the hotel.

The first officer to arrive at the scene was the defendant, Officer Hurley. Fredyma says she explained the situation to him. During that interaction, she admits that she continued to be "excited," was "still animated," spoke in a "raised voice," was crying, and may have been swearing. Id. at 63. Her husband, Joshua, joined the conversation and both addressed

7

Hurley in what Fredyma describes as an "animated" manner. Id. at 64. See also Exhibit C to Defendant's Memorandum (document no. 11-1), Video from Hotel Lobby. Officer Hurley testified that Joshua told him that "this fucking place over-served me" and now won't give me a room. Trial Transcript at 21.[3] See also Police Narrative (document no. 11-3) at 1. Ms. Fredyma was plainly agitated and described herself as "bawling" and being "just beside myself." Fredyma Deposition at 65. Officer Hurley testified that both Mr. and Ms. Fredyma were "very aggravated with what was going on" and the couple repeatedly talked over him as he was trying to converse with them. Trial Transcript, at 22.

Officer Hurley testified that he told Joshua several times to calm down, but he kept "escalating and escalating." Id. Hurley testified that he informed Joshua that if he didn't calm down, he was going to be arrested. "And, at that point, he said, 'Fuck You.' Clinched his fists, and that's when I told him he was under arrest. I was going to place him into protective custody." Id. As Officer Hurley attempted to

---

[3] Ms. Fredyma denies hearing that statement but another of the responding officers, Officer Lamoureux, testified that Mr. Fredyma complained that the bar had "over-served" him. Trial Transcript at 41. The hotel clerk also testified that Mr. Fredyma complained to the police that "we were over-served" at the bar. Id. at 10-11.

8

handcuff Joshua, he resisted and a struggle ensued.  Ms. Fredyma turned to the clerk and called him an "asshole" - apparently because she blamed him, at least in part, for the couple's current predicament.  Fredyma Deposition at 67.

As Officer Hurley and the other responding officers attempted to take Joshua into custody, they took him to the ground in the hotel lobby.  Ms. Fredyma stood over the struggling group, calling out to her husband.  Id. at 68.  Once the officers secured Joshua, Officer Hurley approached Ms. Fredyma, "who was still yelling," Police Narrative (document no. 11-3) at 2.  He told her that he was taking her into protective custody and instructed her to put her hands behind her back.  She complied.  Officer Hurley secured her in handcuffs, and she was transported to the Cheshire County House of Corrections without incident.  She was processed, detained, and released about four hours later, at 6 am.

## Discussion

In the sole remaining count of her complaint, Ms. Fredyma asserts that Officer Hurley, while acting under color of state law, violated her constitutionally protected right to be free from unreasonable seizures.  See generally 42 U.S.C. § 1983.  Specifically, she claims Hurley took her into protective custody

pursuant to RSA 172-B without probable cause to believe that she was "intoxicated," as that term is defined in the statute. Consequently, the questions presented by Officer Hurley's motion for summary judgment are: (1) whether the undisputed material facts of record establish that, as a matter of law, Hurley's conduct did not violate Fredyma's constitutional rights; or, if it did, (2) whether Hurley is nonetheless entitled to qualified immunity.

Chapter 172-B of New Hampshire's Revised Statutes Annotated, the statute pursuant to which Officer Hurley seized Ms. Fredyma, provides that:

> When a peace officer encounters a person who, in the judgment of the officer, is intoxicated as defined in RSA 172-B:1, X, the officer may take such person into protective custody and shall take whichever of the following actions is, in the judgment of the officer, the most appropriate to ensure the safety and welfare of the public, the individual, or both:
>
>     (a) Assist the person, if he consents, to his home, an approved alcohol treatment program, or some other appropriate location; or
>
>     (b) Release the person to some other person assuming responsibility for the intoxicated person; or
>
>     (c) Lodge the person in a local jail or county correctional facility for said person's protection, for up to 24 hours or until the keeper of said jail or facility judges the person to be no longer intoxicated.

RSA 172-B:3, I. That statute defines the term "intoxicated" to mean "a condition in which the mental or physical functioning of an individual is substantially impaired as a result of the presence of alcohol in his system." RSA 172-B:1, X.[4]

I. The Fourth Amendment and Probable Cause.

The Fourth Amendment (made applicable to the states and state actors through the Fourteenth Amendment) provides that citizens shall not be subjected to "unreasonable" seizures. And, it is well established that "the Fourth Amendment requires officers acting under a civil protection statute to have probable cause before taking an individual into custody of a kind that resembles an arrest." Alfano v. Lynch, 847 F.3d 71, 77 (1st Cir. 2017). Based upon the evidence of record, it is plain that Officer Hurley had probable cause to believe that Fredyma was "intoxicated," as that term is defined by state law, when he took her into protective custody.

---

[4] Although not relevant to Fredyma's federal claim, that statute provides both civil and criminal immunity to officers acting under its authority, except for "gross negligence or willful or wanton injury." RSA 172-B:3, VIII.

11

As this court has noted, "probable cause" to arrest an individual (or to detain her under the protective custody statute) exists when:

> the facts and circumstances within an officer's knowledge and of which he or she had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense. Probable cause does not require evidence to prove guilt beyond a reasonable doubt. Probability is the touchstone. The probable cause standard does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable.

Belsito Commc'ns, Inc. v. Decker, 2016 DNH 009, 2016 WL 141664, at *6 (D.N.H. Jan. 12, 2016) (citations and internal punctuation omitted). Here, the facts and circumstances of which Officer Hurley was aware included the following:

1. Shortly before 2 o'clock in the morning, he was dispatched to the Best Western Hotel to respond to a disturbance in the hotel lobby.

2. When he arrived, Hurley "immediately observed a male and a female who appeared extremely agitated." Police Narrative (document no. 11-3) at 1.

3. While Fredyma denies that she was "intoxicated," as that term is defined in RSA 172-B, she admits that she was under the influence of alcohol and her blood alcohol level was above the legal limit for operating a motor vehicle.

4. Fredyma was "excited and animated," "angry," and "frustrated;" she was alternating between "speaking in a raised voice" and "bawling;" and she was swearing at both the hotel clerk and Officer Hurley.

> 5. Fredyma had been drinking since earlier the prior afternoon, she admits she smelled of beer, and does not dispute Officer Hurley's report that she had red, bloodshot, glassy eyes.

Given those undisputed facts of record, a reasonable and prudent officer in Hurley's position, could have reasonably concluded that not only was Fredyma under the influence of alcohol (as she admits), but she was also "intoxicated," as defined in RSA 172-B.[5] Consequently, Officer Hurley had probable cause to take Fredyma into protective custody. The Fourth Amendment demands nothing more.

But, says Fredyma, Officer Hurley failed to give sufficient consideration to less intrusive, non-custodial options that were available to him under state law. See Plaintiff's Memorandum at 10 and 12. Specifically, Fredyma asserts that Officer Hurley failed to adequately consider whether, in his judgment, it would

---

[5] Indeed, based upon his observations of Fredyma, the desk clerk believed she was "probably intoxicated." Trial Transcript at 7. See also Deposition of Dale Delino (document no. 14-2) at 52 ("I have to make assumptions about people I'm dealing with at night when there's a problem like this, and my assumption was this is pretty irrational, and I'm wondering if she isn't maybe in a blackout or intoxicated. There's something - you know - something is not right with this woman and I may be in trouble here.").

13

have been more appropriate to assist Fredyma to her home by calling her a cab. See generally RSA 172-B:3, I(a).[6]

Fredyma has, however, pointed to no authority for the proposition that the Fourth Amendment requires an officer - once he or she has probable cause to seize a person - to consider whether, under the circumstances, options less intrusive than an arrest are available and/or viable. At most, one might plausibly argue that once Officer Hurley had probable cause to take Fredyma into protective custody, the Fourth Amendment imposed some sort of temporal restriction on the duration of her custody. See Ringuette v. City of Fall River, 146 F.3d 1, 5 (1st Cir. 1998) (holding that detention beyond the 12 hours permitted by Massachusetts' protective custody statute "likely" would have violated the Fourth Amendment). But, Fredyma does not challenge the comparatively short period of her detention. Instead, she asserts that the failure to adequately consider non-custodial options specified in the New Hampshire statute violated the Fourth Amendment. It did not.

---

[6] Officer Hurley testified that he did consider the non-custodial options set forth in RSA 172-B:3, but determined that taking Fredyma to the house of corrections was, under the circumstances, the most appropriate course of action. See Affidavit of Officer Daniel J. Hurley (document no. 11-2) at para. 10.

The Fourth Amendment demands that "seizures" be supported by probable cause. If probable cause to arrest exists, the Fourth Amendment is satisfied. It does not compel officers to explore or even consider whether there are options less intrusive than a seizure available to them. This is true even if state law <u>does</u> require such an inquiry. <u>See generally</u> <u>Lucia v. City of Peabody</u>, 971 F. Supp. 2d 153, 164-65 (D. Mass. 2013) (concluding that Massachusetts' statutory requirement that officers detaining someone under the protective custody statute contact a treatment facility did not amount to a constitutional prerequisite to protective custody detention). <u>See generally</u>, <u>Virginia v. Moore</u>, 553 U.S. 164, 174 (2008) ("A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional."); <u>Bd. of Educ. v. Earls</u>, 536 U.S. 822, 837 (2002) ("[T]his Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.") (citation and internal punctuation omitted). <u>See also</u> <u>Holder v. Town of Sandown</u>, 585 F.3d 500, 507-08 and n.6 (1st Cir. 2009) (discussing this concept in

detail and noting that, "linking Fourth Amendment protections to state law would cause them to vary from place to place and from time to time") (quoting Virginia v. Moore, 553 U.S. at 176)).

To be sure, Fredyma may have stated a claim that Officer Hurley violated the provisions of New Hampshire's protective custody statute (whether that alleged statutory violation would have given rise to a viable private cause of action - particularly given the statutory immunity afforded to officers under RSA 172-B - is unclear). But, she has voluntarily relinquished all of her state law claims. All that remains is her Fourth Amendment claim. And, on the record before the court, that Fourth Amendment claim fails as a matter of law.

II. Qualified Immunity.

Even if the court had concluded that Officer Hurley violated Fredyma's Fourth Amendment right to be free from unreasonable seizures, he would still be entitled to the protections afforded by qualified immunity. "Qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The doctrine's prophylactic sweep is broad: it leaves unprotected only those officials who, from an

16

objective standpoint, should have known that their conduct was unlawful." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (citations and internal punctuation omitted). Consequently, as the Supreme Court has observed, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). And, as this court has noted:

> When, as here, a seizure is challenged on grounds that the officers lacked reasonable suspicion (or probable cause), the qualified immunity inquiry does not require the court to decide whether probable cause actually existed, but rather, whether a reasonable officer could have believed that it did. Put another way, defendants are protected by qualified immunity so long as the presence of probable cause is at least arguable. Accordingly, for purposes of the qualified immunity inquiry in this case, the dispositive question is whether it was at least arguable that probable cause existed to believe Manders engaged in disorderly conduct within the meaning of RSA 644:2, II(b).

Byrnes v. City of Manchester, 848 F. Supp. 2d 146, 156 (D.N.H. 2012) (citation and internal punctuation omitted) (emphasis supplied). See also Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004) ("[I]n the case of a warrantless arrest, if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach.").

So, in the context of this case, the relevant inquiry is whether it was "at least arguable" that probable cause existed to believe that Fredyma was "intoxicated" under RSA 172-B. It was. Consequently, even if Officer Hurley had violated Fredyma's constitutionally protected right to be free from unreasonable seizures (he did not), he would, nonetheless, be entitled to the protections afforded by qualified immunity. See, e.g., McCue v. City of Bangor, No. 1:14-CV-00098-GZS, 2015 WL 6848539, at *11 (D. Me. Sept. 22, 2015) (discussing officer's probable cause to detain plaintiff under Maine's protective custody statute and noting that, given the presence of probable cause, officer was shielded by qualified immunity). See also Wheeler v. Gidley, 2005 DNH 122, 2005 WL 2090697, at *6 (D.N.H. Aug. 29, 2005) (concluding that while plaintiff's arrest "was likely not supported by probable cause," arresting officer was, nonetheless, entitled to qualified immunity because a reasonable officer could have believed that probable cause to arrest existed).

## Conclusion

For the foregoing reasons, the defendant, Officer Daniel J. Hurley, is entitled to judgment as a matter of law with regard to Ms. Fredyma's sole remaining claim against him: that he violated her Fourth Amendment right to be free from unreasonable

seizures when he concluded that she was "intoxicated" and took her into protective custody under RSA 172-B. And, because Fredyma "does not object to the entry of judgment on [her] pendent state law claims," Plaintiff's Memorandum at 1, judgment shall be entered in favor of Officer Hurley with regard to those claims as well.

Defendant's motion for summary judgment (document no. 11) is granted. The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 13, 2019

cc: Brian R. Marsicovetere, Esq.
    Samantha D. Elliott, Esq.